IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **HENRY L. WILLIAMS,** | ) | Case No. **C-1-02-533** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Judge Beckwith** |
| **v.** | ) | |
| | ) | **DEFENDANTS' MOTION FOR** |
| **MILTON CAN COMPANY, INC., and** | ) | **SUMMARY JUDGMENT** |
| **BWAY MANUFACTURING, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendants Milton Can Company and BWAY Manufacturing, Inc. (collectively, "Defendants" or "BWAY") move this Court for an order granting summary judgment, thereby dismissing all Plaintiff's claims against BWAY. There are no genuine questions of material fact, and BWAY is entitled to judgment as a matter of law. This Motion is supported by the attached Memorandum, along with the deposition transcripts of Plaintiff Henry L. Williams ("Williams"), Gregory Jahnigen ("Jahnigen), Charles Kobmann ("Kobmann"), Ralph Briggs ("Briggs") and Robert Francia ("Francia") which will be filed with the Court.

Respectfully submitted,

J. L. Sallee, Jr. (0030437)
David D. Black  (0063715)
DINSMORE & SHOHL
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
Trial Attorneys for Defendants
Milton Can Company, Inc. and
BWAY Manufacturing, Inc.

## MEMORANDUM IN SUPPORT

### I.    NATURE OF THE CASE AND INTRODUCTION

Plaintiff Henry L. Williams alleges that on July 29, 2000, he was injured when hit by a forklift operated by a co-worker, Robert Francia. Mr. Francia accidentally backed his forklift into Mr. Williams as Mr. Williams was refueling his own forklift. BWAY paid benefits for Williams' injuries through the Ohio workers' compensation system.

In this action, the Plaintiff alleges that Henry L. Williams' injuries on July 29, 2000 were the result of an intentional tort committed by his employer, BWAY. Ohio workplace intentional torts are defined by the common law annunciated in *Blankenship v. Cincinnati Milacron Chemicals, Inc.*, 69 Ohio St. 2d 608, 433 N.E.2d 572 (1982), and its progeny, including the three-part test set forth by the Ohio Supreme Court in *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St. 3d 100, 522 N.E.2d 489 (1988), and as modified in *Fyffe v. Jeno's, Inc.*, 59 Ohio St. 3d 115, 570 N.E.2d 1108 (1991). In essence, to rise to the level of an intentional tort, the employer must have intended for the employee to be injured. There is absolutely no evidence that BWAY *intended* to injure Mr. Williams.

The evidence in this case confirms why the Ohio Supreme Court urges trial courts to take a hard look at the facts of intentional tort claims:

> There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct ***should not be classified as an "intentional tort"*** and therefore an exception under *Blankenship* or *Jones* [*v. VIP Development Co.*, 15 Ohio St. 3d 90, 472 N.E.2d 1046 (1984)], to the exclusivity of the Act.

*Van Fossen*, 36 Ohio St. 3d at 117, 522 N.E.2d at 504-505 (emphasis added). The undisputed facts in this case demonstrate that BWAY did not intentionally injure Mr. Williams on July 29, 2000. BWAY is therefore entitled to summary judgment as a matter of law.

## II.    UNDISPUTED FACTS

### A.    BWAY Manufacturing

BWAY, a manufacturer of cans for varied use and application, operates a facility in Newtown, Ohio. Over the years the facility has been operated under different names and by different owners including Heekin Can and Milton Can Company. In 2001, Defendant Milton Can Company, Inc. merged with Defendant BWAY Manufacturing, Inc. and continued doing business as BWAY.

### B.    Plaintiff Henry "Jake" Williams

Mr. Williams began working for BWAY in 1969 at its downtown plant when it was known as Heekin Can (Williams Depo. Tr. at p. 25:22-26:5) (Relevant excerpts of the Henry L. Williams Deposition transcript are attached at Exhibit A). At the downtown plant, Mr. Williams worked in hand assembly for two months before being transferred to the Newtown plant (Williams Depo. Tr. at p. 26:12-15).

At the Newtown plant, Mr. Williams held an array of positions over several years (Williams Depo. Tr. at pp. 27-30, 32-33, 66). He first worked as a can line examiner for about three years, then as a seam feeder for four of five years. He then worked in clean-up for a year, salvage for three years, then solely as a forklift driver for approximately sixteen years. Mr. Williams was a trained and licensed operator of forklifts at the facility. (Williams Depo. Tr. at p. 18:7-14).

Mr. Williams next worked in the coil room for seven years (Williams Depo. Tr. at p. 33:23-34:6, 36:6-8). In the coil room, Mr. Williams' duties entailed placing large coils of steel onto spools. Mr. Williams would sometimes use a forklift to place the steel coil onto a spool (Williams Depo. Tr. at p. 37:9-39:23). Mr. Williams would also use a forklift to move stamped metal from the coil room to Plant Nine, one of the areas of the BWAY plant (Williams Depo. Tr. at p. 45:9-13).

### C.    Inventory Day

While employed in the coil room, BWAY asked Mr. Williams to work overtime on an inventory day, July 29, 2000. An inventory day is not a typical work day at the plant (Williams Depo. Tr. at p. 116:6-9) and occurs only once a year (Williams Depo. Tr. at p. 119:19-21). On such days, BWAY employees count the finished goods and equipment in the plant (Williams Depo. Tr. at p. 117:24-118:22). Indeed, most forklifts remain idle on inventory days. On rare

occasions, employees sometimes use them to move a load in order to make another load accessible for counting (Williams Depo. Tr. at p. 120:9-19). It is even more rare for anyone to be working on the outdoor dock during an inventory day as the inventory is located inside the plant (Francia Depo. Tr. at p. 10: 18-23) (Relevant excerpts of the Robert Francia Deposition transcript are attached at Exhibit B).

Mr. Williams agreed to work on this inventory day. Mr. Williams and two others were assigned to count the plate in the assembly area (Williams Depo. Tr. at p. 123:22-124:5). As soon as Mr. Williams' group arrived in the assembly area, he realized a forklift would be required to move certain loads so others would be accessible for inventory (Williams Depo. Tr. at p. 128:16-129:2). Before using the vehicle, however, Mr. Williams saw it would need refueling, indicated by the forklift's fuel warning light. (Williams Depo. Tr. at p. 130:20-131:4). Although there were several propane fuel storage areas in the plant, Mr. Williams decided to proceed to the closest one which was located at an outdoor dock (Williams Depo. Tr. at p. 132:5-18). No one else in Mr. Williams' group was using a forklift at this time (Williams Depo. Tr. at p. 129:17-22).

**D.      The Storage Tanks Located on the Dock**

At the outdoor dock, full tanks of propane fuel are available from a large rack which sits against an outer wall of the plant. Viewing the rack from the outside of the plant, there are two doors which lead into the plant to the right of the propane rack: first, a normal-sized door immediately to the right of the racks; second, a large door (large enough for forklifts and other vehicles) to the right of the small door.

In thirty-one years of employment, Mr. Williams was not aware of anyone being injured in that area. (Williams Depo. Tr. at p. 159:2-18). Mr. Williams was not aware of anyone injured while changing a fuel tank (Williams Depo. Tr. at p. 161:16-19), nor aware of any complaints to management regarding the refueling process (Williams Depo. Tr. at p. 162:11-14).

**E.      The Accident**

Mr. Williams exited the building by driving his forklift through this large door then turned to his right and proceeded down the dock a short distance. Mr. Williams then stopped his forklift, placing the right side of his vehicle in front of the rack of fuel tanks (Williams Depo. Tr. at 145-46).

4

Upon arriving at the propane rack, Mr. Williams dismounted the vehicle and removed the empty gas tank from his forklift (Williams Depo. Tr. at p. 149:11-13). He then took a new gas tank off the rack and began attaching it to the truck through a nozzle device (Williams Depo. Tr. at p. 147:5-11). When he was directly behind his forklift, the back end of a forklift driven by another hourly employee, Robert Francia, hit Mr. Williams (Williams Depo. Tr. at p. 151:22-152:2).

At the time of the accident, Mr. Francia's forklift had a functional back-up alarm (Kobmann Depo. Tr. at p. 20:15-23) and an automatic back-up light which engaged when the vehicle was placed in reverse (Kobmann Depo. Tr. at p. 58:21-23). (Relevant excerpts of the Charles Kobmann Deposition transcript are attached at Exhibit C). Though Mr. Francia was backing his forklift (Williams Depo. Tr. at p. 151:13-15), Mr. Williams did not hear the forklift, see the forklift, nor hear its backup alarm (Williams Depo. Tr. at p. 151:3-12).

Mr. Francia specifically remembers turning his head and looking over his right shoulder before backing up (Francia Depo. Tr. at p. 58). He remembers observing the storage tanks but did not see Mr. Williams. He also looked in his right mirror as he backed up (Francia Depo. Tr. 59). Mr. Francia later heard that Mr. Williams was bent over picking up his hat and that is why he didn't see him (Francia Depo. Tr. at p. 61).

Bob Francia was pretty shaken up after the accident. After the accident, he went to get help. (Francia Depo. Tr. at p. 63). After help arrived, he sat close by and prayed for Jake (Francia Depo. Tr. at p. 64).

At the time of the incident, Mr. Francia was normally assigned to salvage where he regularly operated a forklift (Jahnigen Depo. Tr. at p. 23:1-12) (Relevant excerpts of the Gregory Jahnigen deposition transcript are attached as Exhibit D). On this inventory day, he was operating a forklift on a limited basis. His particular assignment was to move a load of cans out to the dock area so that his group could complete the inventory (Francia Depo. Tr. 5-7).

### F.    Jake's Co-Worker, Bob Francia

Bob Francia was also a long-time employee at the plant. He started at the Newtown plant in 1976. (Francia Depo. Tr. at p. 27). He was first trained on forklift operations prior to coming to BWAY. Despite driving a forklift everyday, he never had any accidents at his prior employment and was never reprimanded for any unsafe act (Francia Depo. Tr. p. 26).

5

After only a few months at the Newtown plant, he was trained by plant personnel to operate forklifts as well as other vehicles at the plant for his position was a utility operator (Francia Depo. Tr. at p. 26). He recalls reviewing files, studying a manual, and taking a driving/operation test (Francia Depo. Tr. at p. 30). He was then certified to operate a fork lift (Francia Depo. Tr. at p. 32). Mr. Francia's job requirements later changed and did not involve operation of a forklift.

When Bob Francia was transferred to salvage in approximately 1998, he had to be retrained and licensed to operate the forklifts (Francia Depo. Tr. at p. 34, 37-38). Corky Kobmann, the plant's trainer since 1987, trained him. (Francia Depo. Tr. at p. 38). After training, Mr. Francia operated a forklift approximately four to five hours a day on an eight to ten-hour shift while he worked in salvage (Francia Depo. Tr. p. 37).

Over the next couple of years, Bob Francia operated a forklift with relatively few incidents. There were some complaints that Mr. Francia had driven his forklift within close proximity of certain co-employees (Jahnigen Depo. Tr. at p. 25:20-25). One such individual who complained was Allen Atris who did not get along with Mr. Francia and the two had several disagreements unrelated to forklift operations (Francia Depo. Tr. p. 44).

In February 2000, BWAY verbally reprimanded Mr. Francia for his operation of a forklift reminding him to look behind him when backing up and to operate his fork truck in a safe manner. Mr. Francia had spilled a load of cans and encroached upon a dock (Francia Depo., Ex. 1). Later, after driving too close to a pedestrian, BWAY suspended Mr. Francia's license for approximately two weeks due to complaints made by local union members (Jahnigen Depo. Tr. at p. 14:15-15:1). BWAY employed a progressive discipline process of a verbal warning, written warning and temporary suspension. Despite these prior accidents and instances of Mr. Francia driving near pedestrians, Mr. Francia had **never** previously hit a pedestrian while operating a forklift, at BWAY or while employed previously (Francia Depo. Tr. at p. 97:21-24).

### G.    BWAY's Stellar Safety Record

The depositions of several witnesses many of whom had a long tenure at the Newtown plant confirm that there were very few accidents involving forklifts and pedestrians. Indeed, the only accident that most witnesses could recall where a pedestrian was struck with a forklift occurred over a decade ago in 1989. Ironically, it was the Plaintiff Jake Williams that was

driving a forklift that hit a pedestrian (Williams Depo. Tr. at p. 163:10-16). The pedestrian suffered only minor injuries and Mr. Williams maintains that the incident was accidental.

## III. ARGUMENT

The Ohio Workers' Compensation Act provides compensation to employees for injuries received in the course of employment. Ohio Const. Art. II, § 35. By statute, this compensation is the exclusive remedy workers have for their employment related injuries: Employers are not otherwise liable for damages. *See* Ohio Rev. Code § 4123.74; *Van Fossen v. Babcock and Wilcox Co.*, 36 Ohio St. 3d 100, 111, 522 N.E.2d 489, 499-500 (1988). In the case of intentional torts, however, the Ohio Supreme Court has declared an exception to this immunity. *Van Fossen*, 36 Ohio St. 8d at 113-14, 522 N.E.2d at 500.

An "intentional tort" in the work place is an act committed with the intent to injure another, or committed with the belief that such injuries are substantially certain to occur. *Jones v. VIP Development Co.*, 15 Ohio St. 3d 90, 95, 472 N.E.2d 1046 (1984). If the employee cannot demonstrate that the employer *actually* intended to injure the employee, then intent may be inferred only if the employee can demonstrate *all of the following*:

(1)    knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;

(2)    knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and

(3)    that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

*Fyffe v. Jeno's, Inc.*, 59 Ohio St. 3d 115, syll. 1, 570 N.E.2d 1108 (1991)(modifying *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St. 3d 116, syll. 5, 522 N.E.2d 489 (1988).

In this case, in order for the Plaintiff to prove that BWAY committed an intentional tort under *Van Fossen* and *Fyffe*,

**Proof beyond that required to prove negligence and beyond that to prove recklessness must be established.** Where the employer acts despite his knowledge of some risk, his conduct may be negligence. Where the risk is great and the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and

7

the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. ***However, the mere knowledge and appreciation of a risk -- something short of substantial certainty -- is not intent.***

*Van Fossen*, 36 Ohio St. 3d at 117, 522 N.E.2d 504 (emphasis added); see also *Fyffe*, 59 Ohio St.3d at 115, 570 N.E.2d at 1110.

There are no facts to support an allegation that anyone at BWAY actually intended to harm Mr. Williams on July 29, 2000. Thus, Plaintiff must rely on the inferred intent standard explained in *Van Fossen* and *Fyffe*. However, there is absolutely no evidence that even remotely suggests an inferred intent by anyone at BWAY to harm Mr. Williams  The forklift accident which injured Mr. Williams, was nothing more than that -- an accident. Accordingly, BWAY is entitled to summary judgment as a matter of law.

**A.    BWAY Had No Knowledge Of The Exact Danger Encountered By Mr. Williams On July 29, 2000.**

An employee has the burden of proving that his employer had "actual knowledge of the exact danger which ultimately caused" the injury. *Sanek v. Duracote Corp.*, 43 Ohio St. 3d 169, 172, 539 N.E.2d 1114 (1989); *see also Kunkler v. Goodyear Tire & Rubber Co.*, 36 Ohio St. 3d 135, 139, 522 N.E.2d 477, 481 (1988). Courts interpreting this requirement have explained that an employee does not have to prove that the employer had an actual subjective intent to cause the injury sustained or that the employer knew that the exact injury sustained would occur. *See e.g., Richie v. Rogers Cartage Co.*, 89 Ohio App. 3d 638, 644, 626 N.E.2d 1012, 1016 (1993). However, under *Fyffe,* the employee must still prove "that the employer knew that because of the ***exact*** danger posed, the employee would be harmed in some manner similar to the injury sustained or that the employer knew that because of the ***exact*** danger posed, it was highly probable (substantially certain) that the employee would be harmed in some manner similar to the injury sustained." *Id.* (emphasis added).

In this case, Plaintiff must show, in addition to the other parts of the three-prong test that on July 29, 2000, BWAY actually knew that Mr. Francia and his operation of a forklift created a dangerous instrumentality or dangerous condition at the BWAY factory and that it was probable that an employee would be harmed in a manner similar to the injury. *First*, it is simply unfair to characterize Robert Francia, a trained and licensed forklift operator, as a "dangerous

8

instrumentality" or "dangerous condition" Indeed, every individual has the propensity to act, on occasion, in a careless manner. Plaintiff will be unable to present any legal precedent where a Court, faced with similar circumstances found an individual to be a dangerous condition The fact that an accident could occur if a driver was careless is a general danger inherent in any manufacturing plant and not the type of danger that would give rise to an intentional tort. *Second*, BWAY took corrective action where appropriate to remind operators to drive cautiously. *Third*, Mr. Francia had never been involved in any accident where a pedestrian was hit by his forklift, nor is there any evidence that he had been reprimanded for almost backing into a pedestrian. The only forklift accident where a pedestrian was hit occurred more than a decade ago. *Fourth*, there had been no prior accidents, let alone forklift accidents, in the dock area, where Mr. Williams was injured. The day Mr. Williams was injured was an inventory day and traffic on the dock area would have been minimal.

1. **Mr. Francia, a co-worker, is not a dangerous condition.**

   a. **There is no case law defining a person as a dangerous condition.**

As noted in *Van Fossen*, "[t]here are many acts within the business or manufacturing process which involve the existence of dangers." (*Van Fossen*) *supra*. Such knowledge of the general risks associated with the manufacturing process do not establish an intentional tort or impute knowledge to an employer of the exact danger.

In this case, Plaintiff contends that an individual, Bob Francia, Mr. Williams' co-worker, is a dangerous driver -- an accident waiting to happen. He claims that sooner or later, Mr. Francia would hit an individual with his forklift. All individuals, however, who work in a manufacturing setting have the potential to act carelessly and cause harm to others. This is a general danger inherent in business and the manufacturing process.

The exposure to the negligence of others does not stop at the workplace and carries over to an individuals' daily routine. Indeed, statistics support that all drivers will be in an automobile accident at some point in their lives. Such statistics do not mean that the drivers have knowledge of the **exact** danger and know the **manner** in which the accident will take place. Plaintiff will not be able to offer any case law or other legal precedent supporting its argument that co-workers qualify as dangerous conditions or instrumentalities.

9

1059550_1.DOC

**b.    Mr. Francia was a trained forklift operator and licensed Ohio driver.**

Mr. Francia was first trained to operate a forklift as well as other vehicles by his prior employer. He was trained again in 1976 after starting his employment at the Newtown plant. When Mr. Francia was transferred to the salvage department in approximately 1998, he had to be retrained and licensed to operate the forklifts (Francia Depo. Tr. at p. 34, 37-38). Corky Kobmann, the forklift trainer, trained him. (Francia Depo. Tr. at p. 38) (Kobmann Depo. Tr. at p. 13:6-10). Since 1998, Mr. Francia operated a forklift approximately half the time during his eight to ten-hour shift. (Francia Depo. Tr. at p. 37). In addition to his forklift license, Mr. Francia held a valid Ohio driver's license. (Francia Depo. Tr. at p. 97).

**c.    The forklift trainer did not believe Mr. Francia was a dangerous operator.**

Charles Kobmann became a forklift operator for BWAY in the early 1970's, then became a BWAY forklift trainer in 1987 after becoming certified as a forklift instructor (Kobmann Depo. Tr. at p. 8-9). Mr. Kobmann had been the forklift instructor for one or both areas of the BWAY plant since 1987 (41:13-15) and trained Mr. Francia to operate a forklift (Kobmann Depo. Tr. at p. 13:6-10).

As the plant's forklift instructor, Mr. Kobmann ensured that workers operate the forklifts safely (Kobmann Depo. Tr. at p. 41:21-23). Should a foremen have problems or concerns with a forklift driver, the foreman can report those problems or concerns to Mr. Kobmann and ask him to retest that driver (Kobmann Depo. Tr. at p. 15).

Despite this established procedure, prior to Mr. Williams' accident Mr. Kobmann had no knowledge of any occasions where Mr. Francia had struck a pedestrian, nor of any occasions where he had nearly struck a pedestrian (Kobmann Depo. Tr. at p. 45). Although Mr. Kobmann recertified Mr. Francia through forklift training after he once spilled a load of cans, Mr. Kobmann had no personal problems or concerns regarding Mr. Francia's driving. Most importantly, other BWAY employees *never* expressed any problems or concerns regarding Mr. Francia's driving to Mr. Kobmann (Kobmann Depo. Tr. at p. 45:4-7).

**d.    Mr. Williams did not believe Bob Francia was a dangerous operator.**

Mr. Williams did not himself believe that Bob Francia's forklift driving abilities posed any serious danger. Mr. Williams never saw Bob Francia operate his forklift unsafely, never witnessed any accidents involving Mr. Francia, nor witnessed any near misses involving Francia (Williams Depo. Tr. at p. 133:24-134:15). Based upon his personal knowledge of his driving, Mr. Williams had no concerns about Mr. Francia's abilities to handle a forklift (Williams Depo. Tr. at p. 134:20-23).

Consequently, Mr. Williams never complained about Bob Francia's driving. He did not warn BWAY or any supervisor that he thought it was unsafe to perform his job with Mr. Francia driving a forklift. In fact, Mr. Williams never complained to management about any co-worker's forklift driving abilities (Williams Depo. Tr. at p. 115:4-17).

Furthermore, Gregory Jahnigen, a member of the BWAY safety committee at various times since 1973, testified that the issues of Mr. Francia's driving and the safe operation for forklifts were never raised nor discussed at any BWAY safety committee meetings (Jahnigen Depo. Tr. at p. 53:6-12).

**2.    BWAY took corrective action to remind all drivers to act cautiously.**

BWAY employed a progressive discipline policy for most infractions of company policies (Briggs Depo. Tr. at p. 42) (Relevant excerpts of the Ralph Briggs deposition transcript are attached as Exhibit E). There was a verbal reprimand which as reduced to writing and placed in an employee's file. After the verbal reprimand, an employee would receive a written reprimand. After that, the employee would be temporarily suspended. If the conduct persisted, the employee would be terminated. (Briggs Depo. Tr. at p. 43).

As to Mr. Francia, BWAY's management took corrective action where appropriate. Mr. Francia was verbally reprimanded for the careless operation of his forklift in February 2000. (Francia Depo., Ex. 1). He was later suspended and pulled off the forklift for a short time when management learned that he had driven his forklift in close proximity to a pedestrian. It is always the hope that this discipline would correct the situation.

### 3. Mr. Francia had never injured a pedestrian.

Despite Plaintiff's accusation that Bob Francia was a horrible driver, Mr. Francia had never before struck a co-worker while operating a forklift, at BWAY or otherwise (Francia Depo. Tr. at p. 97:21-24). Indeed, the only driver to strike a pedestrian in the last decade at the Newtown plant had been the Plaintiff Jake Williams. Furthermore, while there is testimony that Mr. Francia had operated his forklift in close proximity to a pedestrian, there is no evidence that Mr. Francia had ever had a near miss while backing his forklift.

### 4. There had been no prior accidents at the refueling area.

In thirty-one years of employment, Mr. Williams was not aware of anyone being injured in that area. (Williams Depo. Tr. at p. 159:2-18).[1] Mr. Williams never alerted management to any concerns about forklift operation in the refueling area. Mr. Williams never complained regarding visibility in the dock refueling area, nor was he even aware of any complaints regarding visibility there.

Having filed a previous grievance to acquire his forklift job (Williams Depo. Tr. at p. 50:17-51:11), Mr. Williams was familiar with the procedure required to file a grievance (Williams Depo. Tr. at p. 50:10-26). Mr. Williams was aware that he could file a grievance based on safety concerns, but he never filed any grievances regarding any safety issues he may have perceived (Williams Depo. Tr. at p. 53:23-54:4).

Mr. Williams believed BWAY was safety conscious. Indeed, Mr. Williams never offered suggestions of any kind to the BWAY safety committee (Williams Depo. Tr. at p. 50:2-9) nor any foremen to make the plant safer (Williams Depo. Tr. at p.164:18-24). Mr. Williams, in fact, believed BWAY to be a safety-conscious employer (Williams Depo. Tr. at p. 98:9-13).

Quite simply put, no one at BWAY had any reason to believe that Mr. Williams was exposed to an unreasonable danger on July 29, 2000. The danger of Mr. Williams being struck by Mr. Francia's forklift was not a predictable event, but rather an unfortunate accident. Because BWAY had no knowledge of the exact danger encountered by Mr. Williams on July 29, 2000, BWAY should be granted summary judgment as a matter of law.

---

[1] Furthermore, Mr. Williams was not aware of anyone injured while changing a fuel tank (Williams Depo. Tr. at p. 161:16-19), nor aware of any complaints to management regarding the refueling process (Williams Depo. Tr. at p. 162:11-14).

1059550_1.DOC

**B.    BWAY Did Not Know That Harm To Mr. Williams Was Certain
Or Substantially Certain To Occur.**

In order for Plaintiff to collect damages in addition to the benefits awarded them under the Ohio workers' compensation system and to avoid those benefits being their exclusive remedy, Plaintiff must also prove that BWAY acted not simply with an appreciation of a risk, but that BWAY was substantially certain that the risk would come to pass and that injury would result. The substantial certainty requirement itself contains two components, an objective termination and a subjective determination: "(1) Whether the degree of risk present rises to such a level that harm was certain or substantially certain to result, and (2) whether the employer had knowledge and appreciation of this risk." *Sibert v. Columbus*, 68 Ohio App. 3d 317, 321, 588 N.E.2d 252, 255 (citing *Kunkler v. Goodyear Tire and Rubber Co.*, 36 Ohio St. 3d 135, 522 N.E.2d 477 (1988).) Plaintiff cannot show that any of Mr. Williams' supervisors actually *knew* that injury to him was "certain or substantially certain to result," as required by the second part of the *Fyffe* and *Van Fossen* test.

**1.    In Similar Circumstances, Ohio Courts Deem Summary Judgment for a
Defendant-Employer Proper Where an Employee Strikes a Co-Worker
While Backing a Vehicle.**

**a.    _Miko v. Delphi Chassis_**

In *Miko v. Delphi Chassis*, No. 18940, 2002 Ohio App. LEXIS 209 (Ohio Ct. App. Jan. 25, 2002) (Attached as Exhibit F), Plaintiff John A. Miko alleged an intentional tort against his employer where a coworker, Asher, backed a forklift onto plaintiff's foot and ankle. Miko averred that "some people" in the plant expressed concerns about how fast Asher operated his forklift, but did not know whether any of these concerns were reported to supervisors. *Miko* at *5-*6. Plaintiff provided no evidence of any previous injuries to coworkers that were related to the conduct of the forklift drivers, nor could he show that concerns about these issues had been brought to management's attention. *Id.* at *7. Miko admitted that, to his knowledge, no one else had been hit by a forklift at the workplace in his twenty years of working on and around forklifts. *Id.* at *6. The driver, Asher, had a valid license to operate a forklift at the time of the accident and had worked as a forklift driver for the company for more than four years. *Id.* at *6. Based upon these facts, the trial court granted summary judgment for the defendant-employer.

The appellate court affirmed the lower court's grant of summary judgment. The court held that Miko failed to establish the first two prongs of the *Fyffe* test, namely that 1) his employer knew of a dangerous condition at the workplace, and 2) plaintiff's injury had been substantially certain to occur in light of the dangerous condition. *Id.* Because the plaintiff presented no evidence of any previous injuries to workers related to the conduct of the forklift drivers, nor any evidence that such concerns had been brought to management's attention, summary judgment for the defendant-employer was proper.

        **b.**   ***Lapp v. Planes Moving & Storage , Inc.***

Similarly, in *Lapp v. Planes Moving & Storage, Inc.*, No. CA86-12-182, 1987 Ohio App. LEXIS 7949 (Ohio Ct. App. July 20, 1987) (Attached as Exhibit G), Plaintiff Donna Jean Lapp, administratrix of the estate of Charles Lapp, alleged an intentional tort against Charles' employer when he suffered fatal injuries when a co-worker, Richard Fish, struck him while backing a truck in a dock loading area. The trial court granted the defendant-employer summary judgment which was affirmed on appeal. Although Fish had a "less than stellar driving record," including several moving violations and license suspensions, the court relied on the fact that Fish had a valid driver's license on the date of the accident, *id.* at *7, and declared that his driving record, despite the violations, did not suggest that he was an unsafe driver or that pedestrians would be at risk when he operated a truck. *Id.* at *8. The appellate court affirmed the lower court's grant of summary judgment for the defendant-employer.

    **2.**      **Applying the Facts at Bar to the Decisions in *Miko* and *Lapps*, BWAY is Entitled to Summary Judgment as a Matter of Law.**

        **a.**   <u>**Because Mr. Francia Had Never Previously Struck a Co-Worker While Operating a Forklift at BWAY or at Any Other Workplace, Mr. Williams' Accident Was Not Substantially Certain to Occur.**</u>

Prior to Mr. Williams' accident, Mr. Francia had ***never*** struck a co-worker while driving a forklift. This fact is significant in the intentional tort analysis. *See, e.g., Van Fossen*, 36 Ohio St. 3d at 118, 522 N.E.2d at 505. Where there have been no prior injuries or accidents involving the instrumentality or process at issue, it will negate the plaintiff's claim that the employer had actual knowledge that an injury was substantially certain to occur. *Foust v. Magnum Restaurants, Inc.*, 97 Ohio App. 3d 451, 455, 646 N.E.2d 1150, 1153 (1994) (lack of prior

14

accidents involving procedure strongly suggests injury was not substantially certain); *Wehri v. Country Mark, Inc.,* 82 Ohio App. 3d 535, 538, 612 N.E.2d 791, 793-94 (1992) (showing of no prior accidents curtails plaintiff's intentional tort claim); *Gray v. Continental Alloy Steel Co.,* 70 Ohio App. 3d 425, 430, 591 N.E.2d 359, 362 (1990) (record devoid of evidence of knowledge of prior injuries); *Zink v. Owens-Corning Fiberglass Corp.,* 65 Ohio App. 3d 637, 643, 584 N.E.2d 1303, 1307-08 (1989) (lack of prior injuries negates the daunting standard of substantial certainty); *King v. Hancock Mfg. Co.,* No. 97JE72, 1999 WL 1243313 (Jefferson Cnty. Ct. App., Dec. 14, 1999) (Attached at Exhibit H) (no previous injuries).[2]

As in *Lapp, supra,* Mr. Francia's prior driving record may be deemed "less than stellar." A few instances of driving in close proximity to pedestrians, however, does not suggest that he was an unsafe driver or that it is substantially certain that pedestrians would be injured when he operated a forklift. Prior to the accident with Mr. Williams, Mr. Francia had ***never*** struck a co-worker while operating a forklift, at BWAY or otherwise (Francia Depo. Tr. at p. 97:21-24).

Mr. Williams does not deem Mr. Francia to be an unsafe driver. Mr. Williams never saw Mr. Francia operate his forklift unsafely, never witnessed any accidents involving Francia, nor witnessed any near misses involving Francia (Williams Depo. Tr. at p. 133:24-134:15). Mr. Williams had no concerns about Mr. Francia's driving based upon his personal knowledge (Williams Depo. Tr. at p. 134:20-23).

<blockquote>

**b.**     **Because BWAY Had No Significant History of Forklifts Striking Employees, Mr. Williams' Accident Was Not Substantially Certain to Occur.**

</blockquote>

BWAY's history of accidents involving forklifts striking pedestrians is scant.[3] Prior to Mr. Williams' accident, Mr. Kobmann was never forced to retrain a BWAY employee for either striking a pedestrian or a near miss with a pedestrian. In his thirty-seven years with BWAY, and having been a BWAY forklift instructor since 1987, Mr. Kobmann deemed BWAY's forklift safety record as "real[ly] good," especially when compared to other facilities where a few

---

[2] Likewise, where the employer has never received and OSHA citation relating to the activity which caused the injury, the court will consider this a strong indication that the employer did not have actual knowledge to a substantial certainty that an injury would result. *See Sanek,* 43 Ohio St. 3d at 172, 539 N.E. 2d at 1117 ("prior to the accident appellant was never cited by OSHA"); *Cowan v. Rudolph Libbe, Inc.,* No. L-90-087, 1991 WL 3815 (Lucas Cnty. Ct. App., Jan. 18, 1991) (Attached at Exhibit I) ("there is no evidence of a prior OSHA citation").
[3] In fact, prior to Mr. Williams' accident, the most recent incident where a BWAY employee struck and injured an individual while operating a forklift occurred in 1989 with Plaintiff Henry L. Williams as the forklift driver (Williams Depo. Tr. at p. 163:10-16).

employees have been killed (Kobmann Depo. Tr. at p. 18:4-10). What is even more unusual is that this accident occurred on an inventory day on the outdoor dock. During that day, there is little, if any, pedestrian traffic on the outdoor dock. The only reason to ever be in that area was because it was one of several refueling areas for forklifts.

            **c.**     **Because Mr. Francia Was a Properly Licensed and Accredited Forklift Driver At the Time of the Accident, Mr. Williams' Accident Was Not Substantially Certain to Occur.**

As in *Miko* and *Lapp*, at the time of the accident, Mr. Francia had a valid Ohio drivers license (Francia Depo. Tr. at p. 97:1-4) as well as a valid license to operate a forklift while at BWAY (Francia Depo. Tr. at p. 97:5-7). Mr. Francia passed both his written and driving tests under observation of BWAY's forklift instructor since 1987, Charles Kobmann (Kobmann Depo. Tr. at p. 48:16-24). Mr. Francia was legally certified to operate the forklift at the time of the accident and no supervisor or management level employee at BWAY had any idea that Mr. Francia's use of a forklift was dangerous to other employees, nor that an injury to Mr. Williams was substantially certain to occur.

It is clear that Mr. Francia, a properly licensed forklift operator, had no detectable propensity to strike and injure co-workers when operating a forklift. Plaintiff fails to meet his burden of demonstrating that his injury was substantially certain to occur and summary judgment for BWAY is not only warranted, but indeed proper.

**C.**     **BWAY Did Not Require Mr. Williams to Work Under The Alleged Conditions.**

Assuming, *arguendo*, that Plaintiff has shown knowledge by BWAY sufficient to satisfy both of the first two prongs of the *Van Fossen* and *Fyffe* test, ***which he cannot,*** there is absolutely no evidence that BWAY *required* Mr. Williams to continue working under any such dangerous condition. Plaintiff, therefore, cannot satisfy the third prong of the *Van Fossen* and *Fyffe* test. In order to satisfy this third prong, an employee must show that his employer *required* or *demanded* that he perform a specific task even though the employer knew it was dangerous and was certain to result in injury. This is the deliberate "action" by the employer which distinguishes an intentional tort from mere negligence or recklessness. This element was satisfied in *Kunkler* where the employee stated that *he experienced an explosion while mixing a compound on three prior occasions, he reported the explosions to his supervisor* and expressed

16

his specific safety concern, but his supervisor *ordered* him to "run the thing anyway." *Kunkler*, 36 Ohio St. 3d at 139, 522 N.E.2d at 481; *see also Van Fossen*, 36 Ohio St. 3d at 118, 522 N.E.2d at 505.

Here, in extreme contrast, Mr. Williams never witnessed nor experienced Mr. Francia striking a pedestrian, never had any safety concerns regarding Mr. Francia's driving, never reported any such safety concerns, if they existed, to his BWAY supervisors, nor did BWAY order Mr. Williams to work in any allegedly dangerous conditions where injury was a substantial certainty. Plaintiff cannot point to any evidence whatsoever that shows Mr. Williams was *required* to work or that BWAY de*manded* that Mr. Williams work under such dangerous condition or perform an unsafe job within the meaning of *Van Fossen*, *Fyffe* or *Kunkler*. Indeed, Mr. Williams admits that he did not deem his job to be unsafe, nor was he required to work under any conditions he would have deemed unsafe:

**Attorney**:    Can you refuse to do a job if you believe it's unsafe?

**Mr. Williams**:I guess you could refuse, but I never ran into that myself.

**Attorney**:    So in your 31 years, that circumstance never presented itself to you?

**Mr. Williams**: No, it didn't.

(Williams Depo. Tr. at p. 166:7-166:13). Simply put, during his entire career with BWAY, Mr. Williams never felt any job was unsafe and therefore never attempted to refuse to do a job for safety reasons. BWAY ***never*** *demanded* nor *required* Mr. Williams to do perform any job.

Mr. Williams' choice to work on the day of his injury in fact evidences the lack of a demand or requirement by BWAY. BWAY offers employees who work on inventory days, such as the day of Mr. Williams' accident, additional incentive pay similar to overtime (Williams Depo. Tr. at p. 121:15-19). In his own words, Mr. Williams testified that the BWAY general foreman "asked" him to work on this once-a-year inventory day and Mr. Williams freely accepted this offer to work on this inventory day (Williams Depo. Tr. at p. 116:6-16l; 117:16-19). Moreover, it was Mr. Williams' choice to be on that forklift, having volunteered move a load for his inventory group. It was also his choice to be at that particular refueling station given that it was one of several in the plant.

It is evident that BWAY never *demanded* or *required* that Mr. Williams work under any conditions which BWAY knew were dangerous. Consequently, Plaintiff's intentional tort claim

fails for inability to satisfy this independent prong of the *Van Fossen* and *Fyffe* test and BWAY is entitled to summary judgment as a matter of law.

## IV. CONCLUSION

The accident which occurred on July 29, 2000 was unfortunate. However, Mr. Williams' accident falls within the scope of the relief provided by the Ohio Workers' Compensation Act and Plaintiff Henry L. Williams has received and continues to receive benefits under Ohio workers' compensation law. The circumstances surrounding Mr. Williams' injury do not involve the types of conduct which can properly be classified as an "intentional tort," an exception to the exclusivity of the Workers' Compensation Act.

Applying the three-pronged test for "intent" set forth in *Van Fossen,* as modified in *Fyffe*, to the undisputed facts in this case, reasonable minds must conclude that: BWAY was unaware that an accident could occur in such a fashion; BWAY did not know harm was certain or substantially certain to result; and BWAY did not require Mr. Williams to perform an act it knew was unsafe, let alone that BWAY intended to injure Mr. Williams. Because Mr. Williams cannot provide evidence meeting each part of the three-pronged "intentional tort" test, his claim …is the very type of accidental injury… workers' compensation laws were designed to cover. To allow this case to proceed as an 'intentional tort' action would be the ultimate unreasonable and ludicrous extension of that particular common law action." *Lapp, supra,* at *8. Under these circumstances, summary judgment in favor of BWAY is compelled as a matter of law.

Respectfully submitted,

J. L. Sallee, Jr. (0030437)
David D. Black  (0063715)
DINSMORE & SHOHL
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
Trial Attorneys for Defendants
Milton Can Company, Inc. and
BWAY Manufacturing, Inc.

1059550_1.DOC

CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing has been served by ordinary U.S. Mail upon Plaintiff's attorneys, William P. Allen and Patrick W. Allen, CASPER & CASPER, One North Main Street, P.O. Box 510, Middletown, Ohio 45042, this __30th__ day of September, 2004.

David D. Black