UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| HENRY WILLIAMS | * | Case No. C-1-02-533 |
| Plaintiff, | * | Judge Beckwith |
| vs. | * | |
| MILTON CAN COMPANY, INC. and B-WAY MANUFACTURING | * | **PLAINTIFF'S MEMO IN OPPOSITION TO DEFENDANT B-WAY'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | * | |

## NATURE OF CLAIMS

Plaintiff, Henry Williams' claim involves a workplace intentional tort against his employer B-Way Manufacturing. Plaintiff, Henry Williams alleges that B-Way committed an intentional tort against him by permitting a known, reckless forklift operator, Bob Francia to continue driving 10,000-pound fork trucks in and around pedestrian traffic, ultimately resulting in Williams being crushed by the driver. Based on his testimony, the testimony of Francia, co-workers Allen Artis, Greg Jahnigen, Gerry Hanifin, Trainer Charles Kobmann, and that of Production Supervisor Walt Valentine and Supervisor Ralph Briggs, reasonable minds could conclude that B-Way committed a workplace intentional tort.

## FACTS

Henry Williams' Injury

      Henry Williams began his employment with the entity now known as B-Way in 1969 (Williams P. 26, L5)[1] (Relevant excerpts of Williams' deposition are attached at Ex. A). During his tenure, Mr. Williams held several positions at the plant, the last being an operator in the coil room (Williams 34:8). This job involved driving a forklift (Williams 34:6). However, the day of this injury was not a normal workday. Saturday, July 29, 2000 was what B-Way called "inventory day," where both management and hourly employees would count all of the raw material and finished goods (Williams 118:2). On Friday July 28, 2000, Foreman, Ralph Briggs asked Williams to work the following day, inventory day. (Williams 117:17). Williams and several co-workers were assigned to inventory the plate metal in the assembly department (Williams 123:24, 124:1). Part of this assignment required using fork trucks to move loads so that materials and product could be inventoried (Williams 128:20). Other fork trucks were in use in the area (Williams 130:1).

      When Williams first got on the fork truck provided for his group, he realized it needed refueling (Williams 130:17). He immediately drove to the nearest refueling point, a liquid petroleum tank rack located on an exterior loading dock (Williams 132:15). Williams removed the old tank and began connecting the new, full tank when he was struck in the pelvis (Williams 149:20 –150:1). Prior to impact Williams saw no other fork truck in the dock area. He never heard a fork truck, horn, or any backup alarm (Williams 151:5-12). The initial impact dislodged Williams's ballcap and, as he grabbed for it, Williams was pinned at the hips between the counterweight of his 10,000-pound

---

[1] References to deposition testimony will be as follows: (Deponent, Page: Line) relevant portions of the deponents testimony are attached at Exhibits A through H.

2

fork truck and the counterweight of a 10,000-pound fork truck operated in reverse by Bob Francia (Williams 150:15, 151:20). Williams suffered serious permanent and debilitating injuries to his abdomen, pelvis, groin, and legs.

Fork Trucks at B-Way

B-Way's designated forklift trainer, Charles Kobmann, has been with the company since 1966 (Charles Kobmann, 5:12) (Relevant excerpts of Kobmann's deposition are attached at Ex. B). He became a forklift operator in the early seventies (Kobmann 7:21). At that time he received no formal training (Kobmann 8:9). By 1987, Kobmann had taken classes to become a formal trainer for drivers of fork trucks (Kobmann 8:21).

Kobmann readily acknowledged that fork trucks are the biggest hazard or risk faced by employees at B-Way (Kobmann 19:19). He knew, based on his training, experience and common sense that someone pinned by a fork truck was certain to be injured (Kobmann 19:22). As a result, foremen have the right to discipline fork truck drivers (Kobmann 11:21). In fact, it is the foremen's obligation to ask that fork truck operators be retested or re-certified (Kobmann 15:4). Re-certification is required for accidents (Kobmann 11:25-12:1). Violating safe operating rules subjected drivers to discipline because fork trucks are "deadly weapons" (Kobmann 42:1). Kobmann expected management to bring operator safety issues to his attention since he was management's designated trainer (Kobmann 46:12).

Over his many years of employment at the plant, Kobmann was aware of many near misses involving fork trucks and pedestrians (Kobmann 52:15). Most of these instances involved a failure on the part of the fork truck operator to honk the horn

3

(Kobmann 52:23). The approved safe backing procedure was to honk the horn and look over <u>both</u> shoulders (Kobmann 54:10). By doing so, the driver could see anything to the rear of the fork truck (Kobmann 56:10). Kobmann knew that operation of fork trucks contrary to the normal safe procedure increased the probability of an injury (Kobmann 42:1). He knew the failure to honk the horn dramatically increases the possibility of a near miss (Kobmann 53:4). He knew the extreme danger to personnel posed by careless driving (Kobmann 42:4).

Kobmann issued the license Francia held at the time of the incident (Kobmann 13:24-14:1). He believes he re-certified Francia at the request of a foreman for knocking cans over.[2] (Kobmann 16:20-22:4). He has never had to retrain a driver for a near miss with a pedestrian (Kobmann 18:7).

**<u>Bob Francia</u>**

Bob Francia has been with the company now known as B-Way for twenty-seven years (Francia 36:1) (Relevant excerpts of Francia's deposition are attached at Ex. C). During his tenure he held several positions, including operating a fork truck as a utility operator (Francia 29:19). He obtained his initial fork truck operator's certificate at that time (Francia 32:21). He never took the test again (Francia 32:21). He then became a mechanic, and his fork truck license lapsed (Francia 34:17). Following an industrial accident, Francia was reassigned to operating fork trucks again (Francia 35:16). This required Francia to be re-certified as an operator (Francia 37:1). At the time of Williams' injury, Francia had only been driving the fork trucks again for about two years (Francia

---

[2] The fork truck training records are kept separate and apart by Kobmann (Kobmann 14:9). Following the Williams' incident, Kobmann presented his file on Francia to plant management (Kobmann 13:22). The file mysteriously disappeared and has not been provided by B-Way to their counsel during discovery (Kobmann 13:22 16:18).

4

35:6). He only remembers being certified by Kobmann one time (Francia 38:20, 24). He doesn't recall being re-certified after any accidents, nor being trained regarding pedestrian safety (Francia 38:3,10). He doesn't recall any training regarding safe backing procedures (Francia 40:11). He denies being required to honk before backing (Francia 42:20).

Francia doesn't recall any suspension from driving a fork truck (Francia 43:20). He does recall his supervisor, Ralph Briggs confronting him regarding the proper backing procedures for fork trucks (Francia 46:14). The complainant was not identified (Francia 46:10.) As a result of that confrontation, Francia voluntarily offered to surrender his fork truck license (Francia 46:18). He recalls "a couple times" supervisors confronted him about his driving, including an incident where he spilled a load of cans (Francia 46:22). He was counseled by three (3) separate members of management: Ralph Briggs, Luther Smith, and Walt Valentine (Francia 47:2-8). Again, he offered to surrender his license, but management would not accept it (Francia 47:10-13).

On the date of injury, as Francia was procuring a fork truck for his inventory workgroup, someone stopped him and directed him to move a skid of product to the outside dock so the skid was not inventoried (Francia 57:15). He exited the plant and didn't see anyone on the dock (Francia 53:7). He positioned the skid along the left side of the dock (Francia 54:14). At that point the LP storage rack would have been to the rear of his fork truck (Francia 54:17). Nothing was blocking his view to the rear (Francia 56:25). He looked over his right shoulder and began backing (Francia 58:8). As he did so he heard a "thud" (Francia 62:20). As he was accustomed, he did not honk the horn.

Bob Francia's Record

The fork truck trainer described Bob Francia as "flighty" (Kobmann 48:14). Co-workers noted Bob was always in a hurry (Artis 14:10), (Relevant excerpts of Artis' deposition are attached at Ex. D) and didn't see well (Artis 25:14). Francia admitted he was in a hurry on inventory day. According to Francia, B-Way always rushed employees to get things done (Francia 60:19). B-Way "always pushed hard" on inventory day (Francia 60:22). Employees always heard crashes when Bob was around (Artis 40:8). He was always dropping good cans in salvage (Artis 41:16). Although his supervisor Luther Smith knew about it, the products were simply scrapped (Artis 42:19).

Bob had multiple close calls where employees would have to jump out of the way (Artis 18:6). Bob almost hit Jeff Clark, Rick Rhodes, Mr. Alsept, and Rhonda Wallace (Artis 18:16-19:9, 29:25). Only weeks before Williams' injury, Bob almost struck Allen Artis (Artis 13:21, 25). This was reported to Walt Valentine, who said he would "take care of Bob" (Artis 16:19, 25-17:1). Bob was not disciplined, nor was he re-certified following the incident with Artis (Artis 17:4,11). These incidents were taken to the union-management safety committee (Artis 19:20, 20:1). Luther Smith, Bob Francia's supervisor was told about Bob's poor driving, and close calls; "it was said plenty of times that he was going to hit somebody" (Artis 21:22).

Walt Valentine was B-Way's production supervisor on the day Francia crushed Williams (Valentine 5:7) (Relevant excerpts of Valentine's deposition are attached at Ex. E). Prior to the Williams' incident, employees came to him with complaints regarding Francia's reckless driving (Valentine 16:1). Valentine ordered Francia removed from driving fork trucks when he was advised that Bob almost hit a co-worker (Valentine

6

17:7). The incident resulting in that suspension involved Wayne Pike (Valentine 18:19). Valentine pulled Francia off the fork truck to be retrained before he ever drove again (Valentine 21:12-15). Valentine was concerned when he learned of Francia's near miss with Pike (Valentine 21:21). His concern was that somebody would get hurt (Valentine 21:25). He knew a pedestrian didn't have a fighting chance if struck by a 10,000-pound forklift (Valentine 22:4). Despite this he never ensured Francia was retrained (Valentine 22:10, 29:25).

Union steward, Gerald Hanifin, testified he confronted Valentine less than one year before Williams was hit regarding two near misses (Hanifin 25:21) (Relevant excerpts of Hanifin's deposition are attached at Ex. F). These involved Wayne Pike and Aubrey Lucky (Hanifin 24:4,17). Hanifin specifically recalled telling Walt to "get him [Francia] off that truck" (Hanifin 40:6). Hanifin explained to Valentine that Francia almost hit two people, and he didn't want to risk someone else getting hurt (Hanifin 40:11). A subsequent near miss, again involving Francia and Pike, was reported to two supervisors (Hanifin 26:3, 12).

In addition, Valentine knew Francia drove a fork truck off a loading dock, and struck a valve flooding the salvage area (Valentine 24:7,15). These incidents would have reemphasized the need for more training "<u>before</u> he got back on the truck" (Valentine 25:8). If, after retraining, Bob had a second pedestrian near miss Valentine would have permanently removed Francia from driving fork trucks (Valentine 29:13).

Valentine knew of at least three incidents occurring over only a two-day period a mere five months before Francia crushed Williams (Valentine 37:20). In February of 2000 Francia received a verbal reprimand:

> "for operating your tow motor in an unsafe manner resulting in the following incidents: 2/7 failure to look behind you before backing up; 2/8 spilled load of cans; 2/8 sliding off back of dock. Any future incidents of unsafe operation will bring further disciplinary action." (Francia Depo Ex. 1 attached hereto at Ex. C)

Valentine "knew the guy (Francia) needed a refresher course for corrective action to make sure that he understood all the functions of a truck and what he was supposed to do" (Valentine 45:24-46:2).

Greg Jahnigen, union president at the time of this injury, raised safety concerns regarding Francia's unsafe operation to plant manager Brian McGraph and/or human resource manager Mike Conley (Jahnigen 40:11, 13,19) (Relevant excerpts of Jahnigen's deposition are attached at Ex. G). Jahnigen "probably" advised that "its only a matter of time before he [Francia] strikes someone," or at least expressed concerns regarding Francia's speed and carelessness (Jahnigen 41:1).

Ralph Briggs was B-Way's supervisor of the assembly department on the date Williams was crushed (Briggs 8:19) (Relevant excerpts of Briggs' deposition are attached at Ex. H). He knew the key hazard posed by fork trucks was striking something or someone (Briggs 87:18). Although he had authority over fork trucks in assembly, Briggs didn't even know what driving infractions would lead to driver disciplinary action (Briggs 55:7). Ironically, as part of their supervisory training, B-Way specifically taught management listening skills to "listen to people" (Briggs 18:24). Unfortunately for Williams, that training apparently did not include instructions on how to respond to safety complaints those supervisors listened to.

Despite this knowledge, and despite yet at least two other near misses with Wayne Pike and Allen Artis, B-Way never had Francia retrained or permanently removed from

8

driving fork trucks. He continued to drive until Saturday July 29, 2000 at 7:50 a.m., when Bob Francia again recklessly drove his 10,000-pound "deadly weapon" onto the loading dock, completely oblivious to the presence of Henry Williams and another 10,000-pound fork truck both in plain sight. As he had done so many times before, Francia backed in an unsafe manner, until he heard a "thud." Tragically instead of a pallet of cans, or part of the plant structure, that thud was Henry Williams' pelvis being crushed between the two 10,000-pound vehicles. Francia's "loaded gun" finally hit a human target.

## LAW AND ARGUMENT

To succeed on a Civ. R. 56 (C) motion for summary judgment, the movant must demonstrate that:

> "(1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." *Zivich v. Mentor Soccer Club, Inc.* 82 Ohio St.3d 367369-370 (1998), 696 N.E.2d 201 citing *Horton v. Harwick Chem. Corp.* 73 Ohio St.3d 679 (1995), 653 N.E.2d 1196.

A party claiming to be entitled to summary judgment on the grounds that a nonmovant cannot prove his or her case bears the initial burden of specifically identifying the basis of its motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact as to essential element of the nonmovant's case. *Dresher v. Burt* 75 Ohio St.3d 280, 293 (1996), 662 N.E.2d 264. The movant satisfies this burden by presenting competent summary judgment evidence, of a type listed in Civ. R. 56(C), affirmatively demonstrating that the nonmovant has no evidence

to support his or her claims. Id. Once the movant satisfies this initial burden, the burden shifts to the nonmovant to produce specific facts, in the manner prescribed by Civ R. 56(E), indicating that a genuine issue exists for trial. Id. Accord *Vahila v. Hall* 77 Ohio St. 3d 421, 429-430 (1997), 674 N.E.2d 1164; *Mitseff v. Wheeler* 38 Ohio St. 3d 112, 114-115 (1988), 526 N.E.2d 798.

Trial courts should award summary judgment with caution, being careful to resolve doubts and construe evidence in favor of the nonmoving party. *Welco industries, Inc. v. Applied Cos.* 67 Ohio St.3d 344, 346(1993), 617 N.E.2d 1129 "Even the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the party opposing the motion." *Hannah v. Dayton Power & Light Co.* 82 Ohio St.3d 482, 485 (1998), 696 N.E.2d 1044. All reasonable inferences must be drawn in favor of the non-moving party in determining of a genuine issue if material fact exists *Kunz v United Food and Commercial Workers, local 897,* 5 F. 3d 1006, 1008-1009 (6th Cir. 1993). In this case, the evidence presents a sufficient disagreement to require submission to the jury. Since the Court's jurisdiction is founded upon diversity of citizenship under 28 U.S.C. §1332, this Court is bound to apply the substantive law of Ohio. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 82 L.E. 1188 (1938).

### INTENTIONAL TORT STANDARD

Ohio's controlling standard for workplace intentional torts is not an "actual intent" standard. Instead, the intentional nature of the claim is inferred based on:

> 1). Knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;