2). Knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and

3). that the employer, under such circumstances and with such knowledge, did act to require the employee to continue to perform the dangerous task. *Fyffe v Jenos Inc.* 59 Ohio St.3d 115 syll. 1. 570 NE 2d 1108 (1991), 570 N.E.2d 1108.

"under the case-by-case review announced in *Kunkler* [v. *Goodyear Tire & Rubber Co.* 36 Ohio St. 3d. 135,522 N.E. 2d, (1988), 522 N.E.2d 477], the affidavits, depositions, and exhibits, must create an inference that the employer acted 'despite a known threat that harm to an employee is substantially certain to occur' *Emminger v Motion Saver, Inc.* (1990) 60 Ohio App. 3d 14, 17, 572 N.E.2d 257.

### 1.  A Jury Could Reasonably Conclude that B-Way knew of the Exact Danger Posed by Bob Francia Driving Fork Trucks

B-Way argues that a co-employee cannot be a dangerous condition, nor that the co-employees negligence can support substantial certainty of injury. They refer to unspecified "statistics" that eventually all drivers will be in an auto accident. What B-Way ignores is that eventually drivers who routinely operate their vehicles in a reckless manner have their driving privileges revoked. The Second District Court of Appeals in *Miko v Delphi Chassis* (Ex. F of Defendant's Motion) did consider the actions of the plaintiff's co-worker noting: "concerns about how fast Asher drove the forklift," and "training of the forklift drivers or the conduct of the forklift drivers" in their analysis of whether Delphi committed an intentional tort (*Miko* at *2). The Court stressed the absence of any evidence "that concerns about any of these issues had been brought to management's attention Id.

Initially, B-Way cannot dispute the fact that they knew fork trucks posed the greatest hazard in the plant. Their designated trainer admitted so, comparing fork trucks to "deadly weapons" and "loaded guns" (Kobmann 42:1, 65:20). This Court's inquiry

11

should focus on B-Way's knowledge of the dangerous propensities of the driver that they armed with this weapon.

B-Way's production supervisor, Valentine admitted he was aware of multiple complaints, incidents, and near misses involving Francia. Most notably, Francia was suspended for a period of time when Valentine <u>first</u> learned Francia almost struck a pedestrian (Valentine 17: 7). Valentine had an issue, a concern "that somebody would get hurt" (Valentine 21:22-25). Although the suspension was intended to allow for retraining on the safe operation of the fork trucks, Francia denied ever being suspended, let alone retrained (Valentine 22:10) (Francia 39:3).

Valentine admitted the following: Francia's unsafe driving incidents were not isolated instances (Valentine 46:11); in a two day period in February, 2000 Francia was "verbally reprimanded" for three separate instances including; knocking over cans, driving a fork truck off of a dock, and <u>failing to look before backing</u> (Francia Depo Ex 1). Ultimately Valentine acknowledged that he signed Francia's "verbal reprimand" only five (5) months before Francia crushed Williams (Valentine 37:23). He had previously testified that each of theses instances should be dealt with on an individual basis, rather than lumping the violations together (Valentine 34:3). Valentine was also advised that Francia struck a valve in salvage, flooding the area (Valentine 24:15). These incidents were separate and apart form the incidents resulting in his suspension (Valentine 40:4).

The chief union steward, Gerry Hanifin testified that at least three pedestrian near misses involving Francia's driving were taken to management within twelve months preceding Williams' injury (Hanifin 24:4,7; 26:3,12). Co-worker, Allen Artis testified that Valentine was well aware of his near miss with Francia, and was told by Valentine

12

he would "take care of" Francia (Artis 16:25, 17:1). At a minimum, management was aware of at least four near misses within twelve months before Francia crushed Williams. Reasonable minds could readily conclude that B-Way had actual knowledge of, and appreciation of the dangers posed by Francia's reckless operation of these deadly weapons provided by B-Way.

### 2. A Jury Could Reasonably Conclude that B-Way Knew That Employees Subjected to Francia, Armed with a 10,000-Pound Fork Truck, Were Substantially Certain to be Seriously Injured

Since company management rarely admits knowledge in intentional tort cases, Courts routinely recognize that: "Proof of the employer's intent in the second category is, by necessity, a matter of circumstantial evidence drawn from alleged facts appearing in the depositions, affidavits, and exhibits (*Emminger v. Motion Savers, Inc.*(1990) 60 Ohio App. 3d 14,17, 572 N.E.2d 257). In evaluating the "substantial certainty" of an injury, Courts weigh the gravity of potential harm.

> … the determination whether harm is substantially certain to occur involves not only a consideration of the likelihood that harm will occur but also an assessment of the seriousness of the harm if the risk does come to pass. A "substantial certainty" that a condition will cause an injury which may result in death may differ from a "substantial certainty" of an injury which is not life-threatening.

*Padney v. Metrohealth Medical Center* (2001) 145 Ohio App. 3d 759,767, 764 N.E.2d 492.

> "If an employee can establish that the employer was aware of the risk ultimately causing the injury and that the injury was substantially certain to occur as a result of that risk, an inference can be drawn that the employer appreciated the risk of harm giving rise to a substantial certainty of injury"

*Osona v. Art Woodworking & Manufacturing Co.* (August 16, 1989) Hamilton App. No. C-880521 unreported, 1989 WL 92081. (Attached at Ex. I).

13

Here, Valentine's suspension of Francia off of the fork trucks was "absolutely" based on safety concerns (Valentine 46:6). Valentine acknowledged the gravity of the situation: "when it come to almost striking a pedestrian, I had a issue, I had a concern about that" (Valentine 21:21). His concern was "that somebody would get hurt" (Valentine 21:25). Valentine, B-Ways' production manager admits that he was well aware of the precise risk posed by Francia's driving.

Ohio law is clear that an employer need not anticipate precisely when the injury will occur. Rather, the employee's evidence satisfies the *Fyffe* test where injury or death is just a matter of time. *See, e.g. Dirksing v. Blue Chip Architectural Products*, 100 Ohio App.3d 213, 219, 653 N.E.2d 718 (1994).

Regarding the magnitude of this risk, Valentine admits that a pedestrian would not have a fighting chance against a 10,000-pound fork truck (Valentine 22:4). Management's fork truck delegate testified

> "once I knew Jake (Williams) was between two counterweights, I knew I had internal injuries.... I mean that's one of the biggest things, it's not the cuts and all this with the forklifts, it's the internal injuries from the two counterweights, I mean you're talking 10,000-pound trucks" (Kobmann 19:11-16).

Addressing the extent of potential injuries caused by 5,000 pound trucks versus 30,000 pound trucks: "Counterweights on a five, thirty, don't matter. You usually have bought the farm" (Kobmann 73:15).

Plaintiff's human factors expert, Dr. George Smith, has opined B-Way knew employees exposed to Francia were substantially certain to be injured (Smith Affidavit Ex J). His opinions are based on the testimony of B-Way management and hourly employees regarding the multitude of Francia's driving incidents that were reported to

14

management. B-Way's stated policy was to have drivers retrained by Kobmann following accidents and/or near misses. Francia was never retrained following any of his infractions. As noted by Dr. Smith, B-Way consistently violated OSHA regulations found at 29 CFR Ch. XVII Section 1910.178(l)(4)(ii)(A)(B) and (C) (Attached at Ex. K) which provides:

> *(4) Refresher training and evaluations.*
> *(i) Refresher training, including an evaluation of the effectiveness of that training, shall be conducted as required by paragraph (l)(4)(ii) to ensure that the operator has the knowledge and skills needed to operate the powered industrial truck safely*
> *(ii) Refresher training in relevant topics shall be provided to the operator when:*
> *(A) The operator has been observed to operate the vehicle in an unsafe manner;*
> *(B) The operator has been involved in an accident or near-miss incident;*
> *(C) The operator has received an evaluation that reveals that the operator is not operating the truck safely;...*

B-Way admits that there were prior instances where employees sustained injuries from fork trucks. However, they claim that the absence of prior injuries caused by Francia and the absence of fork truck injuries on the dock is dispositive. Ohio law is clear that prior injuries are not a prerequisite to prove an intentional tort:

> ... Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the questions of whether that procedure or device is dangerous and unsafe. If we were to accept the appellee's reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to uses regardless of the knowledge or substantial certainty of the danger of the employer's decision detailed. This is not the purpose of Fyffe. It is not required that one be burned before one knows not to play with fire. *Cook v. Cleveland Electric Illuminating Co.* 102 Ohio App.3d 417, 429-30, 657 N.E.2d 356 (1995).

B-Way cannot now deny it knew with substantial certainty that an injury would result when they armed their extremely unsafe driver with a fork truck. If this Court

15

accepts B-Way's argument, every employer would be encouraged to stick their head in the sand and ignore obvious risks and hazards in the workplace. As quoted by the Sixth Circuit from a Northern District Trial Court decision:

> …the intentional tort exception to the Workers' Compensation Act… [encompasses] a particular scenario under *Fyffe*: one in which the employer is virtually certain that harm is about to occur but chooses to "look the other way" in the interest of continuing the job. One might describe this scenario as one in which the employer takes a stance of 'active ignorance' or even 'willful blindness' in the face of an assured danger. *Jandro v Ohio Edison Co.* 1167 F.3d 309, 316 (6th Cir. 1999), Case No. 98-3034, citing *Jandro v. Ohio Edison Co.*, (N.D.Ohio), Case No. 96-00994.

Various employees repeatedly complained to management regarding safety concerns about Francia's driving. Within roughly twelve months before Francia crushed Williams, management knew Francia regularly spilled loads of cans. (Artis 42:19). They admitted that he had one near miss (Valentine 17:7) and other employees testified they complained about other near misses including one only two weeks before Williams was crushed (Artis 16:19). They also knew Francia failed to look before backing (Valentine 37:20).

Armed with all of this information, B-Way management failed to advise their designated trainer, Kobmann of <u>any</u> of this, with the exception of one instance of knocking cans over (Kobmann 48:11). Kobmann testified that each and every one of these incidents and near misses justified re-certification (Kobmann 45:13, 45:19, 46:1, 46:7). If Francia had yet another incident he would recommend permanent removal of Francia (Kobmann 71:12). The production supervisor would have permanently removed Francia after only two near misses (Valentine 29:13). B-Way management had <u>actual knowledge</u> of at least two near misses within a year predating Williams' injury

16

(Valentine 18:19, Hanifin 26:3,12 Artis 16:19). Yet nothing was done to disarm Francia until it was too late.

The admitted magnitude of the harm posed in this instance was death. The Court has before it many factors: Francia's long history of repeated unsafe driving incidents; the fact that he was suspended for one near miss; he was to be retrained during this suspension; he offered to surrender his license on at least two occasions when confronted by management; and arguably he was never retrained, in violation of OSHA; Valentine testified that two pedestrian near misses would justify permanent suspension; Kobmann testified that each incident justified retraining; Kobmann further testified that four separate instances would justify permanent removal; and the opinions of human factors expert Dr. Smith. Combining these factors requires this Court to deny defendant's motion because reasonable minds could easily conclude that B-Way knew that employees anywhere in the vicinity of Francia while operating those dangerous fork trucks, were substantially certain to be injured. Francia himself had offered to quit driving fork trucks, yet this defendant continued to assign these dangerous instrumentalities to him without training or supervision.

### 3. B-Way Acted to Require Both Williams and Francia to Operate Fork Trucks on "Inventory Day"

Under the third prong of *Fyffe,* Williams need not show that B-Way expressly ordered him to drive the fork truck, or even change the fuel tank on the loading dock. The Ohio Supreme Court has held that a plaintiff can satisfy this burden for purposes of summary judgment "by presenting evidence that raises an inference that the employer, through its actions and policies, required the [employee] to engage in that dangerous task" *Hannah v Dayton Power & Light Co.* (1998) 82 Ohio St. 3 d 482, 696 N.E.2d 1044.

17

It is true that Williams voluntarily agreed to work the Saturday inventory day when directly requested to do so by his supervisor, Ralph Briggs (Williams 116:14). The employees assembled in the cafeteria at the start of inventory day (Williams 121:1). He was grouped with co-employees and assigned to count plate metal in the assembly area (Williams 124:5). He was assigned these duties by B-Way (Williams 128:1). Inventory involved the use of fork trucks because the group was required to count loads stacked on top of one another (Williams 128:20). When he boarded the fork truck provided by B-Way to begin his assigned task, he realized the fork truck needed refueling (Williams 128:12). Defendant now infers that Williams had choices of refueling stations. In acting conscientiously, he proceeded to the closest refueling station, the one assembly used "all the time" (Williams 132:21).

Just like Williams. Francia would have been assigned his duties that day by management (Briggs 76:11). Francia was specifically instructed by someone to drive a load of cans out to the dock so that they were not included in the inventory count (Francia 51:15).

Pedestrians were permitted on the dock (Briggs 49:18). In fact, the fork truck trainer himself acknowledged that the LP storage area is a place drivers would expect pedestrians (Kobmann 74:25). The dock area was well traveled by fork trucks and pedestrians (Jahnigen 35:9, Hanifin 15:21), a fact known to this defendant.

Based on this testimony that Williams was simply performing associated tasks to enable him to complete his assigned duties, reasonably minds could reasonably conclude that B-Way, through its practices and procedures acted to require Williams and Francia to perform their duties on the dock on July 29, 2000.

18

## **CONCLUSION**

In light of the foregoing, Plaintiff Henry Williams, has presented competent credible evidence demonstrating genuine issues of material fact as to each of the three factors outlined in *Fyffe*. Based on this evidence and inferences drawn therefrom a jury could reasonably conclude that B-Way did commit acts and omissions constituting an intentional tort. The egregiousness of the circumstances presented herein rests in the fact that the employer had been expressly warned about the problems with Francia's driving near persons and objects but simply chose to ignore the hazards presented. B-Way relies on active ignorance and/or willful blindness in their defense. The evidence of record is clearly sufficient to met the test of *Fyffe*.

Accordingly, Defendant's motion for Summary Judgment should be denied.

Respectfully submitted,

CASPER & CASPER

By: /s/ William P. Allen
William P. Allen (#0064046)
Patrick W. Allen (#0014394)
CASPER & CASPER
One North Main Street
P.O. Box 510
Middletown, Ohio 45042
(513) 424-1347
(513) 424-0622 Fax
wallen@casperlaw.com

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing has been served upon Davis Black, Esq., DINSMORE & SHOHL, 1900 Chemed Center, 255 East Fifth Street, Cincinnati, Ohio 45202 by ordinary United States mail, postage prepaid, this _____ day of October 2004

                                                William P. Allen  (#0064046)
                                                Patrick W. Allen (#0014394)
                                                Attorney for Plaintiff

20