```
 1
 2
 3
 4
 5              IN THE UNITED STATES DISTRICT COURT
 6              FOR THE SOUTHERN DISTRICT OF OHIO
 7                        WESTERN DIVISION
 8                            - - -
 9   HENRY WILLIAMS              :
                                 :
10            Plaintiff(s),      :
                                 :
11       vs.                     :   CASE NO. C-1-02-533
                                 :
12   MILTON CAN COMPANY, INC.,   :
     and BWAY MANUFACTURING      :
13                               :
              Defendant(s).      :
14
15                            - - -
16                          DEPOSITION
17   of WALTER VALENTINE, taken before me, Therese A. Corley,
18   Court Reporter and Notary Public in and for the State of
19   Ohio at Large, pursuant to notice and agreement of
20   counsel, as on Cross-Examination, at the offices of
21   Hampton Inn Eastgate, 858 Eastgate North Drive, in the
22   City of Batavia, County of Clermont, and State of Ohio, on
23   Thursday, the 23rd day of September, 2004, beginning at
24   9:28 A.M.
25                            - - -
```

Charlene Nicholas & Associates, LLC
5136 Phillipsburg-Union Road, Englewood, OH 45322
Phone: (937) 836-7878    Fax: (937) 836-1718



EXHIBIT
E

```
 1    APPEARANCES:

 2        On Behalf of the Plaintiff(s):

 3
              WILLIAM P. ALLEN, ESQ.
 4            CASPER & CASPER
              1 North Main Street
 5            Middletown, Ohio  45042

 6
          On Behalf of the Defendant(s):
 7
              DAVID D. BLACK, ESQ.
 8            DINSMORE & SHOHL LLP
              255 East Fifth Street, Suite 1900
 9            Cincinnati, Ohio  45202

10

11        Also Present:

12            Henry Williams

13

14                         - - -

15                   INDEX TO EXAMINATION

16    WALTER VALENTINE                              PAGE

17        Cross-Examination by William P. Allen, Esq.   3

18                         - - -

19                 NO EXHIBITS WERE MARKED

20                         - - -

21

22

23

24

25
```

Charlene Nicholas & Associates, LLC
5136 Phillipsburg-Union Road, Englewood, OH  45322
Phone:  (937) 836-7878     Fax:  (937) 836-1718

1    A.    Thirty-six years next week.

2    Q.    What is your current position or title?

3    A.    Production supervisor.

4    Q.    And I will represent to you that Mr. Williams

5  was injured on July 29th of the year 2000; what was your

6  position at that time?

7    A.    Production supervisor.

8    Q.    What are your duties as production supervisor?

9    A.    To oversee seven can lines production.

10   Q.    Do you have any safety duties?

11   A.    Yes.

12   Q.    What are those?

13   A.    We have -- we have a safety audit check we do

14 once a week.

15   Q.    When did the company institute or implement the

16 safety audit check weekly, before or after Jake's injury

17 of 2000?

18   A.    After.

19   Q.    Were there any audits or safety walk-around at

20 any time in the year 2000 before his injury?

21   A.    Yes.

22   Q.    Tell me what they were and --

23   A.    Well we always check and do -- make sure guards

24 are in place and people is working safe.

25   Q.    But no formalized check-off procedure or --

```
 1   any knowledge of any injuries caused by fork trucks
 2   striking pedestrian?
 3       A.   Not while I was in Columbus.
 4       Q.   Prior to Jake's incident with Bob were you aware
 5   of prior instances where pedestrians had been struck by
 6   fork trucks?
 7       A.   I was told about the Cincinnati plant when I
 8   came back to Cincinnati in '97.
 9       Q.   Okay.
10       A.   That there had been an accident.
11       Q.   Tell me what you were told about that.
12       A.   What I recall was a truck hit a pedestrian.
13       Q.   Do you know who was driving?
14       A.   I believe they -- I believe they said it was
15   Jake Williams.
16       Q.   Do you know who was struck?
17       A.   I don't recall.
18       Q.   Was it a male or female; do you remember?
19       A.   I want to say it was a female but I'm not for
20   sure.
21       Q.   Prior to Jake's injury in your position as
22   various levels of supervisor did anyone have occasion to
23   come to you with concerns over anyone's driving habits?
24       A.   Yes.
25       Q.   Tell me about those instances.
```

| | | |
|---|---|---|
| 1 | A. | What I recall somebody came and they complained |
| 2 | about Bob had had a couple of -- he had an incident where | |
| 3 | he dropped some cans and then someone came and complained | |
| 4 | that they went around a corner and Bob almost struck them. | |
| 5 | Q. | Was that Alan Artis? |
| 6 | A. | I don't recall who it was. |
| 7 | Q. | Were those two separate instances? |
| 8 | A. | Yes. |
| 9 | Q. | Did you ever have occasion to write any truck |
| 10 | drivers up for unsafe operation? | |
| 11 | A. | I don't recall if I -- if I personally wrote |
| 12 | them up. | |
| 13 | Q. | Okay. Do you recall any of your |
| 14 | undersupervisors writing anyone up, wouldn't they have to | |
| 15 | report to you that they were writing someone up? | |
| 16 | A. | They would report to me but I don't recall if |
| 17 | they did. | |
| 18 | Q. | Are you aware whether any drivers had ever been |
| 19 | temporarily suspended from operating a fork truck for | |
| 20 | unsafe operation? | |
| 21 | A. | Yes. |
| 22 | Q. | Who was that? |
| 23 | A. | Bob Francia. |
| 24 | Q. | Do you know how long before Jake's injury? |
| 25 | A. | I don't recall. |

```
 1      Q.   Was it that year?
 2      A.   I'm -- I don't recall if it was that year or
 3 not.  I believe I want to think it was but I'm not real
 4 for sure.
 5      Q.   Okay.  Do you recall what prompted that
 6 suspension?
 7      A.   When someone -- it was brought to my attention
 8 that someone almost got hit, that's when I had Bob removed
 9 from the truck.
10      Q.   Do you know how long he was removed from the
11 truck?
12      A.   No.
13      Q.   Did you refer him back to Corky Kobman for
14 retraining?
15      A.   Don't recall.
16      Q.   Have you ever referred anyone back to Corky
17 Kobman for retraining before Jake's injury?
18      A.   Don't recall.
19      Q.   When this individual that you cannot recall came
20 to you and told you about the incidents where Bob almost
21 hit someone, I think we were probably talking about the
22 same thing you talked about earlier where he came around
23 the corner and someone was almost hit by him; there was
24 only one incident that you recall where Bob almost hit
25 someone or were there multiple incidents where people came
```

1   to you with concerns about Bob?
2       A.   The people that came to me could have been my
3   supervisor.
4       Q.   Okay.
5       A.   So I don't recall any other incidents.
6       Q.   Okay.  So you were only aware of one incident
7   where Bob almost hit someone?
8       A.   Yes.
9       Q.   You aren't sure whether it was Alan Artis?
10      A.   No.
11      Q.   Did you ever hear that Bob almost hit Wayne
12  Pike?
13      A.   I recall Wayne Pike.
14      Q.   And you recall that Bob almost hit Wayne Pike or
15  someone reported to you that --
16      A.   Right.
17      Q.   And was that a different incident than the one
18  that got him suspended?
19      A.   That's the one got him removed.
20      Q.   How about incident involving Aubrey Lucky and
21  Bob Francia?
22      A.   I don't recall.
23      Q.   How about Ken Parrett?
24      A.   Don't recall that one.
25      Q.   Jeff Turner?

1  Q. And one instance where he almost hit someone was
2  sufficient for you to suspend him off the truck for a
3  period of time?
4  A. Well when either the supervisor came to me or
5  the employee came to me and they was pretty well irate
6  so --
7  Q. Do you recall anything more about --
8  A. I just recall the -- when you named the Wayne
9  Pike I really lost his name, but from what I understand he
10 was pretty well -- he was pretty irate and I side look,
11 you know, we've had incident, previous incidents where he
12 dropped cans, let's pull him off. I was -- my plans was
13 to get him retrained.
14 Q. Before he got back on the truck?
15 A. Right.
16 Q. Would you agree that those two instances that
17 you ultimately suspended him for were enough to lead you
18 to believe that without retraining he was a dangerous
19 driver?
20 A. I know those 22 incidents the first dropping the
21 cans wasn't a whole lot, but when it come to almost
22 striking a pedestrian, I had a issue, I had a concern
23 about that.
24 Q. Concern that he was a safety risk?
25 A. Yeah, that somebody would get hurt, right.

```
 1        Q.   And you knew from common sense that a pedestrian
 2   struck by a 10,000-pound fork truck doesn't have a
 3   fighting chance, correct?
 4        A.   Correct.
 5        Q.   And that interaction is certain to result in
 6   some injury to some magnitude?
 7        A.   Yes.
 8        Q.   Do you know if Bob was ever retrained following
 9   that suspension?
10        A.   Don't know.
11        Q.   Do you know how he got back on the fork trucks?
12        A.   No.
13        Q.   Did Bob ever come to you with regard to a
14   dispute about Alan Artis?
15        A.   I don't recall.
16        Q.   Did Bob ever offer you his driver's certificate,
17   his fork truck driver's certificate and say look, if
18   you're going to give me this much trouble, here's my
19   license, take it?
20        A.   I don't know if he -- I don't recall him doing
21   that.
22        Q.   If he testified that he did that, you wouldn't
23   dispute that, would you?
24        A.   If he said he did it, then, you know, I'd have
25   to -- I agree, but I don't recall.  You know, I mean four
```

```
 1   time up until the period of time that Jake was struck, do
 2   you recall any other complaints or concerns bought to your
 3   attention about Bob Francia?
 4        A.   I don't recall.
 5        Q.   Do you ever recall an incident where Bob slid a
 6   fork truck or part of a fork truck off the loading dock?
 7        A.   I think I heard some stuff about it but didn't
 8   know the whole -- didn't get the whole -- all the
 9   particulars.
10        Q.   Was that before the incident with Wayne or
11   after?
12        A.   Oh, don't recall.
13        Q.   How about an incident where Bob struck a valve
14   maybe in salvage and it flooded the salvage area?
15        A.   I recall that.  I recall the valve struck.
16        Q.   He being Bob?
17        A.   And Bob.
18        Q.   And do you know if that was backing?
19        A.   Don't know.
20        Q.   What, if anything, do you know about that
21   incident?  Do you know when it happened in relation to the
22   Wayne Pike incident?  Was it between that and the time he
23   struck Jake?
24        A.   I don't know.
25        Q.   If that occurred between the time you suspended
```

```
 1   him off the trucks and intended to have him retrained and
 2   the time he struck Jake, would that incident justify more
 3   severe discipline?
 4        A.   No.
 5        Q.   Why not?
 6        A.   When he struck the pipe?
 7        Q.   Yes.
 8        A.   It would have just -- it would have just made me
 9   for sure to push the more training before he got back on
10   the truck.
11        Q.   You mean retraining with Corky?
12        A.   Retraining with Corky.
13        Q.   Have you ever seen Bob's driving file?
14        A.   No.
15        Q.   Even following this incident with Jake did you
16   ever see Bob's driving file?
17        A.   No.
18        Q.   Have you talked to anybody about Bob's driving
19   file?
20        A.   Since the accident?
21        Q.   Yes.
22        A.   No.
23        Q.   How about before the accident or injury to my
24   client?
25        A.   Don't recall.
```

1   after he struck Jake; is that correct?
2       A.   I don't know.
3       Q.   That's what Bob told us.  He said that part of
4   his coming back was he agreed that, didn't want to, wasn't
5   going to drive a fork truck and I can understand that
6   having been through what he went through.  But what I want
7   to know is regardless of whether it happened before the
8   Wayne Pike incident or after the Wayne Pike incident we're
9   talking about up until the day Jake got hurt how many
10  close calls would you have given Bob before you just said
11  that's it Bob, you're a loaded gun, we're moving you off
12  the fork trucks?
13      A.   If he had been retrained by Corky, the next
14  incident.
15      Q.   What if he hadn't been retrained by Corky?
16      A.   Don't know.
17      Q.   When you suspended him for the Wayne Pike near
18  miss who did you communicate your desire to have him
19  retrained by Corky?
20      A.   His supervisor.
21      Q.   Which was whom?
22      A.   Ralph Briggs.
23      Q.   And did you do anything to insure that Ralph
24  Briggs had him retrained by Corky?
25      A.   No.

```
 1       Q.   Did Ralph Briggs ever tell you that he was
 2  retrained by Corky?
 3       A.   No.
 4       Q.   Were you at the plant on the date of this
 5  injury?
 6       A.   No.
 7       Q.   Where were you?
 8       A.   Home.
 9       Q.   You didn't have to participate in the inventory
10  day?
11       A.   No.
12       Q.   Had you ever participated in the inventory day?
13       A.   Yes.
14       Q.   So you're familiar with what goes on around the
15  plant on inventory day?
16       A.   Right, yes.
17       Q.   A lot of pedestrian traffic, people going around
18  counting cans?
19       A.   Yes.
20       Q.   And metal?
21       A.   Right.
22       Q.   Fork trucks moving products so that you can
23  access tickets to do the inventory?
24       A.   Yes.
25       Q.   Salaried people working with hourly people side
```

1  you consider each one individually or lump them together
2  in a group?
3     A.   Probably individually.
4     Q.   So that would take them from the verbal to the
5  written to suspension, would you take them off the trucks
6  at that point?
7     A.   It's a severity of the accident. They come
8  close to striking a pedestrian, yes.
9     Q.   And then if they subsequently struck a valve,
10 would that be the straw that broke the camel's back, they
11 just would be barred from the trucks permanently?
12    A.   Don't know.
13    Q.   Besides the instances that we've talked about
14 some of which you don't recall but I think you recall
15 something about Bob on the dock with the fork truck, you
16 don't know much about the details but you recall that he
17 had --
18    A.   Just I've heard secondhand.
19    Q.   But you were aware that he spilled cans at least
20 on one occasion?
21    A.   Right.
22    Q.   And he had at least one near miss and the one
23 that you know about is with Wayne Pike.
24    A.   Yes.
25    Q.   You don't know of any other near misses with

```
 1   plant they have a safety meeting to try to address
 2   corrective actions and how to avoid that in the future and
 3   they usually include all members of management.  Was there
 4   any kind of a meeting like that after this incident?
 5        A.   I don't recall.
 6        Q.   Do you recall any member of management ever in
 7   your conversations following this incident saying that I
 8   knew it was just a matter of time before he actually got
 9   somebody?  And hindsight is 20-20 but --
10        A.   Don't recall.
11        Q.   I'm going to hand you what was marked
12   Plaintiff's Exhibit 1 --
13            MR. ALLEN:  Let's go off the record for a
14   second.
15            (A discussion was held off the record.)
16   BY MR. ALLEN:
17        Q.   -- that was marked Plaintiff's Exhibit 1 in Bob
18   Francia's deposition.  If you would just take a look at
19   that and see if you recognize that document.
20        A.   Yeah, I recognize it.
21        Q.   Is that your signature towards the bottom
22   right-hand side?
23        A.   Yes.
24        Q.   And what's that date next to your signature if
25   you can make it out?
```

```
 1   than what is outlined in Exhibit 1?
 2       A.   Yes.
 3       Q.   Yes, you believe it was a separate --
 4       A.   Separate.
 5       Q.   -- incident.
 6            Do you, and again I'm taxing your memory here,
 7   do you recall whether the Wayne Pike incident happened
 8   before or after this?  And I'm referring to the incidents
 9   outlined in Exhibit 1.
10       A.   I don't recall.
11       Q.   Okay.  Do you know what documentation there
12   would have been for the period of time Bob was suspended
13   off the fork trucks?
14       A.   Don't know of any.
15       Q.   And I think I asked you and I think you told me
16   you don't know, but my memory is not great either, haven't
17   had enough coffee; you don't know how long he was
18   suspended?
19       A.   No.
20       Q.   Okay.  Do you want to take a break and get some
21   coffee and I'll review my notes and we may have you out of
22   here and we can check and make sure our other witness is
23   hanging out there?
24       A.   That's fine.
25            (A recess was taken.)
```

```
 1   retrained by Corky, yes.
 2        Q.   And your intention was not to let Bob back on
 3   the fork trucks until after recertification with Corky?
 4        A.   Right.
 5        Q.   Did you think Bob was an unsafe driver until he
 6   was retrained by Corky?
 7        A.   No.
 8        Q.   Then why were you having him retrained?
 9        A.   He had the incidents before and then when he
10   almost struck the pedestrian I made -- you know, I drew
11   the line in the sand.
12        Q.   But what was your thought process for drawing
13   that line, I mean, if he wasn't unsafe, why have him
14   retrained?
15        A.   I was think theory was to have him retrained for
16   corrective action to make sure that he understood.
17        Q.   So as part of your decision making did you think
18   that based on his actions with the near miss, the spilled
19   cans, and sliding off the dock which we've looked at here
20   and this other incident you recall, that maybe he didn't
21   recall the rules of the road for safety and needed the
22   refresher course with Corky before he got back on that?
23        A.   With these incidents and with the incident with
24   Wayne Pike I -- I just, you know, knew the guy needed a
25   refresher course for corrective action to make sure that
```

```
 1   he understood all the functions of a truck and what he was
 2   supposed to do.
 3       Q.   And part of that correction -- corrective action
 4   not only to discipline Corky -- or to discipline Bob, but
 5   your decision was based on safety concerns?
 6       A.   Absolutely.
 7       Q.   And these were not isolated incidents either,
 8   the three listed on your verbal reprimand that you signed
 9   one was on 2/7/2000, and two of them were on 2/8 so in two
10   days he had three infractions, correct?
11       A.   Correct.
12            MR. ALLEN:  I thank you for your time.  I hope
13   it hasn't been too painful.
14            THE WITNESS:  No, it was fine.  Thanks.
15            MR. BLACK:  Very good.  Okay.  We're off the
16   record.
17            MR. ALLEN:  Do you want to tell him he has the
18   right to review or do you want to --
19            MR. BLACK:  We already talked about that, do you
20   want to read the deposition or do you want to just trust
21   she got everything correct?
22            THE WITNESS:  I trust everything's correct.
23            MR. BLACK:  I'll take a look at it.
24            We'll waive signature.
25            (The deposition concluded at 10:49 A.M.)
```