```
 1
 2
 3
 4
 5               UNITED STATES DISTRICT COURT
 6                SOUTHERN DISTRICT OF OHIO
 7                    WESTERN DIVISION
 8                         - - -
 9
10   HENRY WILLIAMS,                :
                                    :
11           Plaintiff,              :
                                    :
12   vs.                             :  CASE NO. C-1-02-533
                                    :
13   MILTON CAN COMPANY, INC. and    :
     BWAY MANUFACTURING,             :
14                                   :
             Defendants.             :
15                                   :
16                         - - -
17                      DEPOSITION
18   of RALPH BRIGGS, taken before me, Kathy J. Nicholson,
19   Registered Professional Reporter and Notary Public in and
20   for the State of Ohio at large, as on cross-examination,
21   at the Hampton Inn, 858 Eastgate North Drive, in the City
22   of Batavia, County of Clermont, and State of Ohio, on
23   Monday, the 27th day of October, 2003, beginning at 8:53
24   o'clock, a.m.
25                         - - -
```

Charlene E. Nicholas & Assoc., Inc.
111 Briar Heath Circle, Dayton, OH 45415-2601
Phone: (937) 277-8512    Fax: (937) 275-817



EXHIBIT H

```
 1    APPEARANCES:

 2        On behalf of the Plaintiff:

 3        WILL ALLEN, ESQ.
          CASPER & CASPER
 4        One N. Main Street
          P.O. Box 510
 5        Middletown, OH  45042

 6        On behalf of the Defendant:

 7        DAVID BLACK, ESQ.
          DINSMORE & SHOHL
 8        1900 Chemed Center
          255 East Fifth Street
 9        Cincinnati, OH  45202

10    ALSO PRESENT:  JOHN MCMAHAN

11

12                         - - -

13                  INDEX OF EXAMINATION

14    Name of Witness                              Page
      Ralph Briggs
15
         Cross-Examination by Mr. Allen ..........   4
16

17                         - - -

18

19

20

21

22

23

24

25
```

Charlene E. Nicholas & Assoc., Inc.
111 Briar Heath Circle, Dayton, OH  45415-2601
Phone: (937) 277-8512    Fax: (937) 275-8179

1  Q. What kind of cans were they?

2  A. Beverage cans.

3  Q. Did you have to operate any machinery, or was it
4  just basically watching these cans and making sure they
5  were okay?

6  A. Just watching the cans, making sure they was
7  okay.

8  Q. Let me bring you up to date now. Are you still
9  with Bway now?

10 A. Yes, I am.

11 Q. And what's your position there?

12 A. Supervisor.

13 Q. Of what?

14 A. Assembly department.

15 Q. And back when Jake was injured in July of 2000,
16 what was your position then?

17 A. Supervisor.

18 Q. Of what?

19 A. Assembly department.

20 Q. Okay. That helps me out so I know a little bit
21 about that you've been at the -- has there been anytime
22 that you have not been employed by Heekin Can or some
23 company that subsequently purchased that facility?

24 A. No.

25 Q. So you were still going to or you were still

```
 1    Q.   Where did you go to management classes?
 2    A.   Right there at the plant.
 3    Q.   Tell me what you -- what training you had in
 4  management classes?
 5    A.   We went through a group called the PACE.
 6    Q.   P-A-C-E?
 7    A.   Uh-huh.
 8    Q.   Does that stand for something?
 9    A.   I really don't know.
10    Q.   What did you learn in the PACE program?
11    A.   We learned the skills of proper writing, speed
12  reading.  Learned to listen.  That pretty much covered it.
13    Q.   Do you know why they taught you about proper
14  writing?  Was that for recordkeeping?
15    A.   Yes.
16    Q.   What about speed reading, why did you have to
17  learn to speed read?
18    A.   Just to pay attention to what you read, you
19  know.
20    Q.   And listening, to me it would make more sense to
21  train the people under you to listen to what you had to
22  say, but can you tell me why they emphasized listening to
23  the supervisors?
24    A.   So you could listen to the people.
25    Q.   Was there any safety training in this supervisor
```

```
 1      Q.   At the time of Jake's injury, were there any of
 2  those mirrors available for people, either pedestrians or
 3  for truckers, entering or exiting the facility there?
 4      A.   Yes.
 5      Q.   Do you know where they were located?
 6      A.   I believe they were overhead on the dock.
 7      Q.   The outside, covered portion of the dock?
 8      A.   Yes.
 9      Q.   Do you know if they're still there now?
10      A.   I believe, yes.
11      Q.   Is there any prohibition for pedestrian traffic
12  in and about the corner of the building here where the LP
13  tank storage facility is located?
14      A.   Would you please repeat that?
15      Q.   At the time of Jake's injury, was there any rule
16  prohibiting pedestrian traffic in the area that you've got
17  this three?
18      A.   No.
19      Q.   Would pedestrians use the large garage-type door
20  to enter and exit the coil department?
21      A.   They could.
22      Q.   Was that door generally open during the summer?
23      A.   Yes.
24      Q.   How about the door on the other corner of the
25  building where you've got the L from coil, was that open
```

```
 1              You never had to write any fork trucker up for
 2    any violation of work rules?
 3         A.   No.
 4         Q.   So you don't know what infractions would lead to
 5    the progressive discipline program as far as safe
 6    operation of the trucks?
 7         A.   No, I'd have to ask personnel.
 8         Q.   The progressive discipline program at the time
 9    of Jake's injury, was that part of a collective bargaining
10    agreement?
11         A.   Yes.
12         Q.   Do you know if you still have the CBA that was
13    in effect at the time of Jake's injury for 2000?
14         A.   CBA meaning what?
15         Q.   Collective bargaining agreement.
16         A.   Do I still have it?
17         Q.   Yes.
18         A.   No.
19         Q.   Does the union keep copies of the old
20    agreements?
21         A.   I couldn't say.
22         Q.   Do you know who the employee union reps were at
23    the time of this incident?
24         A.   One, I would know one.
25         Q.   Who was that?
```

1    schedule?
2       A.   No.
3       Q.   Do you know why Bob would have been hurrying to
4    conduct the inventory?
5       A.   No.
6       Q.   Would Bob have been assigned to operate the fork
7    truck by a supervisor?
8       A.   I would say yes, if he was on the truck, yes.
9       Q.   If he was on the truck, it was his job that day
10   to operate the fork truck?
11      A.   Yes.
12      Q.   Did you know about the incident where Jake
13   struck that other woman before completing this form?
14      A.   Did I know about it?
15      Q.   Yes.
16      A.   Yes.
17      Q.   On the second page, maybe we'll just refer for
18   ease of reference, these are Bates B-1 through B-6. On
19   B-2, it looks like a portion that was cut off from B-1.
20   It's got severity potential, and over on the right, have
21   similar incidents occurred before, and you marked no.
22   Actually, one similar incident had occurred before,
23   correct, that you were aware of?
24      A.   Yes.
25      Q.   When you were aware of that prior incident, were

```
 1   experienced person?
 2       A.   Yes.
 3       Q.   They would be your representative to train that
 4   employee to safely perform their job functions?
 5       A.   Yes.
 6       Q.   Would part of that training by that employee
 7   representative be to identify hazards associated with that
 8   job and how to avoid them?
 9       A.   Yes.
10       Q.   Would you agree that the key hazards of fork
11   truck operation would be losing a load or striking someone
12   or something?
13            MR. BLACK:   What was the question?
14   BY MR. ALLEN:
15       Q.   Would you agree that a key hazard of fork truck
16   operation would either be losing a load or striking
17   something or someone?
18       A.   It could be a key hazard, yes.
19            MR. ALLEN:   You got copies of these, didn't you?
20            MR. BLACK:   You sent me some, but it wasn't that
21   many.
22            MR. ALLEN:   These are doubles.
23            MR. BLACK:   Probably was that many then.
24            MR. ALLEN:   I've got two or three.
25            MR. BLACK:   From 8-8-03?
```